SEASHORE REALTY & INVESTMENT COMPANY, Petitioner, *v.*
PUERTO RICO PLANNING BOARD, Respondent.

No. 27.   Argued December 4, 1952.—Decided June 30, 1053.

*Henry G. Molina* and *David Curet Cuevas* for petitioner. *Rafael R. Fuertes* and *A. Sandín del Manzano* for respondent.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

On April 30, 1951, the corporation Seashore Realty & Investment Company filed before the Puerto Rico Planning Board, hereafter referred to as the Board, established by Act No. 213 of May 12, 1942 (Sess. Laws, p. 1106), a declaration of its intention to subdivide a parcel of land known as "La Trinchera" Development, pursuant to Article 4 of Planning Regulation No. 3 (Subdivision Regulation). In a complementary declaration the petitioner reported that the property sought to be subdivided was part of a segregation, an urbanization approved by the Municipality of San Juan. It further reported that up to the date of the petition fifteen out of twenty-eight lots had been segregated and sold; there remained, therefore, thirteen lots "which although the latter lots are actually subdivided and urbanized, we hereby pray for an Order from the Board ratifying this technical segregation, in order to record and sell them as individual lots." It further prayed the Board to be

excused from presenting construction and recording plans since the work to be done was a subdivision previously accepted (Article 75 of the Subdivision Regulations) and in addition because the subdivisions were of a simple nature (Article 6 of that same Regulations).

On June 27, 1951, the Planning Board issued an order entitled "Requirement of facilities · and recording plan" which states that "In order to consider this subdivision to be of a simple nature, it must be furnished previously with an adequate system of electric distribution and public lighting in conformity with the requirements of the Water Resources Authority; moreover, those lots comprised in the petition of segregation which face the Insular Highway as well as the other lots facing that highway and which up to now have not been legally segregated and recorded in the Registry of Property, must be furnished with sidewalks and curbs . . . The sidewalks bordering the insular highway must be 1.50 meters in width with their outer edge 9.00 meters from the axis of the highway, with provision for a planting strip 2.00 meters wide in the space between the sidewalk and the curb to be constructed in accordance with the typical cross section for main streets 18.00 meters wide." The Board further said: "Petitioner must submit to the consideration of this Board in accordance with the requirements set forth in the Subdivision Regulations a recording plan covering all those lots which have not yet been recorded in the Registry of Property, without including in such lots the area occupied by the sidewalks." The petitioner was notified of this order on July 10, and on July 23, 1951 petitioner moved for a reconsideration praying the Board to be excused from complying with all the requirements fixed by the Board except for the requirement of furnishing the Subdivision with a system of electric distribution and public lighting. The grounds for this petition were that the urbanization in dispute was planned prior to the effectiveness of the Act establishing the Planning Board and that the sub-

division in lots began after October 14, 1940, the date deed No. 57 fixing the conditions of the development was executed before Notary Diego Guerrero Noble, and therefore the petitioner again prayed the Board to ratify the aforesaid development. Petitioner also averred that the requirement of a sidewalk 1.5 meters wide along Highway No. 57, with its outer limit 9 meters from the axis of the highway, in effect amounted to a condemnation of private property without due compensation since "that highway being scarcely nine meters wide," the petitioner would have to donate a strip nine meters wide along its development in order to comply with that requirement. It made a similar allegation concerning the condition of reserving a planting strip. Finally, it alleged that the Board had implicitly approved the subdivision by previously authorizing the following transactions: (1) segregation of one of the lots (whose registration, it stated in its order, had not been established) because it had all the minimum facilities required by the regulation; (2) by sanctioning the sale of another lot for the same reason; (3) by reaching a similar finding in regard to another two lots of the urbanization in controversy. The Board held a public hearing on petitioner's motion for reconsideration. The documentary evidence presented by petitioner consisted of the previously mentioned deed of urbanization No. 57, a certificate by the Registrar of Property establishing the registration of various lots segregated from the estate in question, a mortgage deed securing a promissory note payable to bearer and a plan of the urbanization.

On February 13, 1952, the Board entered an order "Denying the motion for reconsideration." In its order the Board reached the following findings of fact and conclusions of law:

"1—That since the present case was submitted to the consideration of this Board when Act No. 213 of 1942, as amended, and the Subdivision Regulations were already in force, both the Act and the Regulations are wholly applicable to the present case insofar as the subdivision and development requirements

are concerned, unless there is clear evidence that all the proposed lots were actually segregated prior to September 4, 1944, and that all the streets in question were urbanized and accepted as such by the proper authority or agency.

"2—That no authentic documentary evidence has been submitted to this Board which shows that the streets of 'La Trinchera' Development were built and accepted by the Department of Health and the Government of the Capital in accordance with the laws and regulations in force in 1940.

"3—That the certificate of the Registrar of Property which was presented only demonstrates that lots Nos. 2, 4, 15 and 22 were segregated and recorded prior to September 4, 1944, since the remaining lots contained in that certificate do not coincide in area with the corresponding lots appearing in the plan presented.

"4—That although it is true that this Board considered and decided, individually and separately, six of the lots included in the plan, some conditions were imposed upon all except two of the lots, but the fact that the latter cases were considered separately does not bar this Board from now considering the urbanization as a whole and from deciding a case applying the Regulations to the extent they may be applicable.

"5—That the fact that a development plan contains the layout of several separate lots, does not establish the actual segregation of the lots marked in the plan, where no segregation has been made in fact and executed in some feasible manner prior to September 4, 1944.

"6—That even the fact that a building has been constructed upon a lot prior to September 4, 1944 does not amount to a segregation in fact nor render inoperative to that case the Subdivision Regulations.

"7—That the submission of deed No. 57 of October 14, 1940, does not prove that the lots in question were segregated in fact prior to the effectiveness of the Act and of the Subdivision Regulations, since it only shows the intention of the property owner to subdivide in the future, establishing the standards to be fulfilled and a number of covenants.

"8—That since no showing has been made to the satisfaction of this Board through proper evidence that the streets of 'La Trinchera' Development were built and accepted by the proper agencies pursuant to the Acts and Regulations then applicable, this Board is fully empowered to require facilities such as side-

walks, curbs, planting strips as provided by the Regulations; the exercise of such power does not amount to an abuse of discretion or an exercise of the power of eminent domain without paying just compensation, since this requirement is demanded from every subdivider and is included within the police power of the state."

On petition from the Seashore Realty & Investment Company we ordered the Planning Board to send up the record of this case, in order to review it pursuant to the provisions of § 26 of the Planning and Budget Act of Puerto Rico, Act No. 213 of May 12, 1942, as amended. Petitioner alleges that the Board committeed five errors, to wit:

1.—"The Board erred in requiring petitioner, as a prerequisite to the approval of the Development, to build sidewalks 1.5 meters wide in the lots facing the Insular Highway and especially in requiring that the edge of the sidewalks should be nine meters from the present axis of that highway.

2.—"The Board erred in requiring petitioner as a prerequisite to approval of the development, to provide for a planting strip two meters wide, in the space between the sidewalk and the edge of the curb to be constructed.

3.—"The Board erred in requiring petitioner, as a prerequisite to approval of the Development, to exclude from the area of the lots, that surface used for sidewalks already constructed.

4.—"The Board erred in weighing the evidence, in reversing previous decisions, for the sole purpose of compelling petitioner to donate part of the land which is needed to widen Insular Highway No. 57.

5.—"The Board erred in deciding the case without affording petitioner a fair and impartial hearing."

■ The first obstacle we find to reviewing the errors assigned is the absence in the record of the case sent to us, of a transcript of the proceedings in the oral hearing held before the head of the legal division of the Board. The petitioner, in its fifth assignment of error, avers that it was deprived of a fair hearing because the Board did not furnish a stenographer to write down the testimony of the witnesses, and therefore it was bound to argue the case solely through

an attorney without producing witnesses. Section 16 of the Planning Act, etc., *supra*,[1] provides, in its third paragraph, that: "If the case is set to be heard by a member, by the head planner, or by the chief of the legal division, the decision thereof, *together with a statement of the evidence* and his conclusions as to the fact and the law, as well as any other matters pertinent to the issue set forth by him, shall be filed with the Board for decision." (Italics ours.) Petitioner effectually waived the right it might have exercised, especially when the Board could have used other means, apart from a stenographer, to make a transcript. Yet we wish to point out that the decision of this case would have been simplified had there been a transcript of the record. Had petitioner presented oral evidence, we would have requested the Board to send up the transcript[2] as part of the record of the case, and in default thereof we would have ordered a new hearing on that ground. *Rent Director v. District Court*, 73 P.R.R. 379; *Rivera v. Chancellor of the University*, 73 P.R.R. 361 and *De Chabert v. District Court*, 74 P.R.R. 608.

As regards the first assignment of error we think petitioner is mistaken. Petitioner's brief argues that "to compel petitioner to build a sidewalk nine meters from the axis of a road which is only nine meters wide, amounts to forcing it to convey nine meters of land from each one of its lots to be used by the government for a public purpose, that is, the construction of a road." As may be seen, petitioner bases its contention on an erroneous premise. It misconceives the axis of a road for its sides. The axis is the line that divides the road lengthwise through the middle. Thus, it is not true that petitioner must donate nine meters of land all along its proposed urbanization. In its brief the

---

[1] We shall hereinafter refer to that Act as "the Act."

[2] Where it becomes impossible to send up to this Court the transcript of the evidence for exceptional and well-grounded reasons there may be substituted for such transcript a narrative statement of the oral evidence. *Cf. Carrión v. Sampedro*, 74 P.R.R. 385.

Board states that Highway No. 57 is twelve meters wide. The petitioner—upon whom rests the burden of proof—has not overcome that averment with any evidence. Its brief simply makes the limited statement that the road is 9 meters wide. Petitioner, because of its interest in the case, has the duty to place this Court in a position to review its case. If it fails to do so, it has no cause to complain. We therefore, accept the Board's statement to the effect that the road is twelve meters wide.[3] It then follows that if the road is 12 meters wide, there are 6 meters from the axis to the edge of the road and petitioner is therefore obliged to build the required sidewalks only 3 meters from the roadside. We must then consider under what power the Board requires petitioner, as a condition precedent to the approval of the petition to subdivide, to build the sidewalks at a distance of 9 meters from the axis of the road, that is, at a distance of 3 meters from its edge.

Petitioner concedes "that the State has powers to compel the owner of a property abutting a public street to build a sidewalk, along the frontage of his property," but it maintains that such sidewalks must be built on public property while in this case it is being compelled to build sidewalks on its private property. It therefore argues that this amounts to an exercise of the power of eminent domain without due compensation. Petitioner is wrong.

The power of the Board to insist on the fulfillment of minimum requirements in accordance with its Regulations, before approving a subdivision plan, is well settled. Section 24 of the Planning Act. Thus, it has been held that the State may require a subdivider to reserve a minimum area to be used for public purposes, such as recreation parks. *Zayas v. Planning Board*, 69 P.R.R. 27, 33. It has also been

---

[3] Besides, we may presume that the law has been obeyed and that the road in question was constructed of the proper width in compliance with the command of the Act to Fix the Right of Way of Insular and Municipal Roads approved March 14, 1907, as amended by Act No. 63 of March 7, 1912.

held that it may require that the streets giving access to an urbanization have a certain width. *Brous* v. *Smith*, 304 N. Y. 104, 106 N. E. 2d 503. *Cf. Acosta* v. *Planning Board*, 71 P.R.R. 540. Likewise, setback restrictions have been held valid. *Gorieb* v. *Fox*, 274 U. S. 603, 53 A.L.R. 1210. It has been held, finally, that since the construction of a development results in an increase in traffic along the place of construction, the subdivider may be required to dedicate a strip of land along the public road which borders the urbanization in order to widen the road in accordance with a general road plan. *Ayres* v. *City Council of City of Los Angeles*, 34 Cal. 2d 31, 207 P. 2d 1.

We have no doubt that the construction of petitioner's urbanization will bring an increase in traffic along Highway No. 57. As a reasonable measure to avoid that risk the Board under the police power of the State may require the petitioner to build a sidewalk whose outer limit will be 3 meters from the roadside (9 meters from the axis). This does not amount to a taking of its property. *Cf. Acosta* v. *Planning Board, supra.* Paraphrasing the California Court in *Ayres* v. *City Council of City of Los Angeles, supra,* we can say that it is the petitioner who is seeking to acquire the advantages of lot subdivision and upon whom rests the duty of compliance with those reasonable conditions which are fashioned for the safety and general welfare of the lot owners and of the public.[4] *Cf. Torres* v. *Planning Board*, 74 P.R.R. 881.

Examining the provisions of the Subdivision Regulations we notice that a space, named "planting strip," must

---

[4] Section 3 of the Act provides:

"The powers granted in this Act shall be exercised for the general purpose of guiding a coordinated, adjusted and economic development of Puerto Rico which, in accordance with present and future needs and human, physical and financial resources, will best promote the health, safety, morals, order, convenience, prosperity, defense, culture, economic soundness and general welfare of the present and future inhabitants, and such efficiency and economy in the process of development and in the distribution of population, of the uses of land and of public improvements as will tend to create conditions favorable thereto."

be kept between the clear roadway and the sidewalks to separate the traffic of vehicles from the transit of pedestrians. Article 43 of the aforesaid Regulation.[5] That planting strip, required by the Regulations to be 2 meters wide on the part which may be used to plant trees, must be built in the space of 3 meters which petitioner must leave between the roadside and the outer edge of the sidewalk to be built. Petitioner must also build the curb between the planting strip and the road. Thus, petitioner's contention that the Board is trying to reserve land to widen the road falls of its own weight, for once petitioner builds the planting strip with the curb it will occupy the entire width of 3 meters. We have seen that Article 43 requires minimum widths for planting strips, but does not impose maximum dimensions. If the Board's requirement is equivalent to demanding a planting strip 3 meters wide, petitioner has failed to show any arbitrariness or unreasonableness in that requirement. We cannot disturb a decision of the Board unless it has, as a question of law,[6] acted arbitrarily, abusing its discretion or gone beyond the powers granted by law.

---

[5] Said Article reads thus:

"Article 43.—*Planting Strips.*—The planting strip is herein defined as the space between the clear roadway and the sidewalk of a thoroughfare, and includes the space occupied by the curb. Planting strips separate the transit of pedestrians from traffic of vehicles, and can be used for the planting of trees.

"Planting strips shall be required on all the thoroughfares with the exception of Alleys and Crosswalks. In the residential areas, planting strips shall have the following minimum widths:

"(a) On Avenues, not less than two and a half (2.50) meters.
"(b) On Main Streets, not less than two (2) meters.
"(c) On Local Streets, not less than one and one fourth (1.25) meters.
"(d) On Dead-end Streets, not less than one and one fourth (1.25) meters.
"(e) On Marginal Streets, not less than two and a half (2.50) meters.

"In the commercial and industrial centers, planting strips of these thoroughfares may have widths less than the above, in accordance with the provisions of Article 44."

[6] Section 26 of the Act provides that review shall be limited exclusively to questions of law.

*Torrance* v. *Bladel*, 155 P.2d 546; *Bosworth* v. *City of Lexington*, 125 S.W. 2d 995; *Mingo Holding Co.* v. *Town of Harrison*, 48 A. 2d 919. Finally, Article 44 of the Subdivision Regulations provides that sidewalks shall be built on both sides *of* all thoroughfares. This means that the sidewalks must be built not *on* the thoroughfares but on the property alongside those thoroughfares. And in its brief petitioner has conceded the validity of that regulation.

■ Now, petitioner claims that the Act and the Regulations are not being applied uniformly since the requirement to build sidewalks 9 meters from the axis of the road has not been requested from other lots adjoining petitioner's. It maintains, therefore, that "Those sidewalks would not be used by pedestrians since no one will be so blind . . . as to walk along the road, and after reaching petitioner's lots, turn around perpendicularly from the road and walk until he meets the sidewalks in order to use them. This measure would not serve the proposed intention of building a sidewalk for pedestrians. And secondly, in order to build full length sidewalks it would be necessary to take land from the lots belonging to the other adjoining owners, for which they would have to be paid. [The result would be] to pay some and to take from others gratuitously. The injustice is so obvious that we submit the question to the Hon. Court without further argument." If that were the case, the decision of the Board would be invalid for regulations must be applied uniformly and without arbitrary distinctions. *Leonard Inv. Co.* v. *Board of Adjustment of Trenton*, 4 A. 2d 768; *Darlington* v. *Board of Councilmen*, 282 Ky. 778, 140 S.W. 2d 392. However, it appears from the Board's decision that the lots numbered 2, 4, 15 and 22 are the only lots from which the Board does not exact such requirements since they were segregated and recorded prior to 1944. *Matos* v. *Planning Board*, 66 P.R.R. 417; *Wilcox* v. *Registrar*, 67 P.R.R. 445; *Ramos* v. *Registrar*, 69 P.R.R. 660. With regard to the remaining lots which petitioner alleged had also been

recorded as shown by a certificate of the Registrar of the Property which it attached to its petition, the Board found that the area of those lots did not coincide at all with the corresponding lots shown in the plan submitted. See, findings of fact No. 3, *supra*. Petitioner offered no evidence to disprove that finding nor has it made any averment before us that it is incorrect. We find, therefore, that is not a case of a discriminatory and arbitrary application of the regulation. It is only from two lots of those abutting on the road (numbers 2 and 4) that the Board does not demand such requirements, because otherwise it would be giving a retroactive effect to the Planning Act. *Matos* v. *Planning Board, supra; Wilcox* v. *Registrar, supra; Ramos* v. *Registrar, supra; Alicea* v. *Registrar*, 71 P.R.R. 554. We hold that the first error was not committed.

■ Nor was the second error committed. As we have seen, Article 43 of the Regulations provides for the establishment of a planting strip to separate the traffic of vehicles from that of pedestrians. No doubt, that requirement is substantially related to the public health, safety and general welfare and therefore is valid. *Ayres* v. *City Council of City of Los Angeles, supra*. In its brief before us the Board avers that this strip required from petitioner, although labelled "planting strip", is actually a safety strip. We have no doubt that this is so in effect. The Board probably used the term "planting strip" induced by the provision of Article 43 of the Regulations to the effect that such a strip "can be used for the planting of trees." Since that requirement is, as we have said, valid, we must find that the Board did not commit the second error assigned.

■ Nor did it commit the third error. Article 40 of the Regulations provides that "The right-of-way of a thoroughfare shall be taken as the shortest distance between the lines which limit all the space dedicated for public use in this thoroughfare," and authorizes the Board to require the

transfer or reservation of such right-of-way.[7] No doubt the sidewalks are a part of the right-of-way since they are space dedicated for public use. See, also, the typical cross sections which appear on pages 52 and 53 of the Compilation of Planning Rules and Regulations for Puerto Rico, published by the Board in 1952. Hence, the Board can require that the space occupied by sidewalks already built be deducted from the lots of the urbanization, since pursuant to Article 40, it is the subdivider who must transfer or reserve the right-of-way. Conceding, as does the petitioner, the validity of the Regulation, the position assumed by the Board in exacting such requirement is correct. We can presume that the already constructed sidewalks involved in this assignment of error are the sidewalks of the local or main streets of the urbanization. If, pursuant to Article

---

[7] That Article provides:

"Article 40.—Rights-of-way.—The right-of-way of a thoroughfare shall be taken as the shortest distance between the lines which limit all the space dedicated for public use in this thoroughfare. The right-of-way shall be transferred or reserved by the subdivider according to requirements of the Board, and for this purpose the following minimum widths are hereby established:

"(a) For Express Highways, not less than forty-two and half (42.50) meters, of which twenty (20) meters shall be transferred corresponding to the Marginal Streets, and the difference reserved.

"(b) For the Avenues, not less than thirty-three (33) meters, of which nineteen (19) meters shall be transferred, that is, nine and a half (9.50) meters on each side, corresponding to a moving and a parking lane for vehicles on each side, and the space used for sidewalks and planting strips, and the difference reserved.

"(c) For Main Streets, not less than eighteen (18) meters, all of which shall be transferred.

"(d) For Local Streets, not less than thirteen (13) meters, all of which shall be transferred.

"(e) For Dead-end Streets, not less than eleven (11) meters, all of which shall be transferred.

"(f) For Marginal Streets, not less than ten (10) meters, all of which shall be transferred.

"(g) For Alleys, narrow passages, not less than six (6) meters, all of which shall be transferred.

"(h) For Cross-walks, not less than three (3) meters, all of which shall be transferred."

40, the right-of-way of main and local streets shall be transferred as a whole by the subdivider, with sidewalks considered a part of the right-of-way, it is logical that the latter cannot be included in the area of the lots. And petitioner does not question the authority of the Board to require the subdivider to build the necessary streets in order to give access to the urbanization, insisting that they be of a given width, see *Brous* v. *Smith, supra,* nor does it question the validity of the provisions of the Act and the regulation providing that streets of urbanizations shall be public. Section 11(*b*) of the Act and Article 20 of the Regulations.

The fourth error was not committed either. Article 82 of the Regulations [8] provides that a previous decision of the Board not in accord with the Regulations shall not be accepted as valid unless the Board has expressly permitted a concession or variation. Petitioner has not shown that this is so in the case of the other lots. The Board was not, therefore, bound by such previous decisions if it deemed that they were erroneous because not in accord with the Regulations. Finally, the Board is not obliged to assume the same position in every case. *Young* v. *City of Abilene,* 195 S.W. 2d 838; *Brous* v. *Town of Hempstead,* 69 N.Y.S. 2d 258; *Appeal of Hasley,* 151 Pa. Super. 192, 30 A. 2d 187.

For the reasons set out, the decision appealed from will be affirmed.

---

[8] Said Article provides:

"Article 82.—*Record of Special Cases.*—Any variation or omission of details or works existing in the approved subdivision plans, shall be interpreted as approved in accordance with the present Regulations and not in the form submitted. That is, it will be interpreted that any exemption or variation to the provisions of the present Regulations have been permitted, as special cases, in accordance with the provisions set above under this Title IX, only when they are expressly related and described in the corresponding resolution or minutes of the Board, and the reasons for such permission given by the Board. Variations or concessions that are not on record as special cases, and specified in the corresponding resolution, or in minutes of the Board, shall not be accepted as valid, and the Subdivider shall be required to carry out the works in strict agreement with all the requisites of these Regulations."